# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF ARKANSAS

**Kathi Sue Evans**                                                                 **Plaintiff**

**v.**                          **CASE NO. 3:14CV00019 JTR**

**Carolyn W. Colvin, Acting Commissioner,**
**Social Security Administration**                                           **Defendant**

## ORDER AFFIRMING THE COMMISSIONER

Kathi Sue Evans seeks judicial review of the denial of her application for disability insurance benefits (DIB). This is Evans's second application for disability. Her previous application was denied on July 13, 2010.[1] Evans last worked in February 2009 as a customer service representative.[2] Evans applied for DIB on April 6, 2011, with an alleged onset date of March 28, 2009.[3] Evans's date last insured (DLI) is December 31, 2013.[4] Evans bases disability on fibromyalgia, celiac disease, asthma, osteoarthritis, manic depression and lupus.[5]

**The Commissioner's decision.** The Commissioner's ALJ determined that

---

[1] SSA record at p. 143.

[2] *Id.* at p. 148.

[3] *Id.* at p. 129.

[4] *Id.* at p. 143.

[5] *Id.* at p. 147.

Evans has not engaged in substantial gainful activity since the alleged onset date.[6] Evans has severe impairments - fibromyalgia; celiac disease; a history of juvenile rheumatoid arthritis; depressive disorder, not otherwise specified; and pain disorder associated with both medical and psychological factors.[7] None of Evans's severe impairments meet the Listings,[8] and Evans can perform sedentary work except that she needs to have the option to sit and stand at will with only occasional use of her hands to grasp or finger, and she is limited to simple, routine, repetitive tasks with only occasional interaction with co-workers and the general public.[9] The ALJ held that Evans cannot perform any past relevant work,[10] but can perform the positions of surveillance monitor, call-out operator and order clerk, positions identified by the vocational expert (VE) as available in the state and national economies.[11] Evans's application was denied.[12]

---

[6]*Id.* at p. 12.

[7]*Id.*

[8]*Id.* at p. 13.

[9]*Id.* at p. 14.

[10]*Id.* at p. 21.

[11]*Id.* at pp. 22-23.

[12]*Id.* at p. 23.

After the Commissioner's Appeals Council denied a request for review, the ALJ's decision became a final decision for judicial review.[13] Evans filed this case to challenge the decision. In reviewing the decision, the Court must determine whether substantial evidence supports the decision and whether the ALJ made a legal error.[14]

**Evans's allegations.** Evans maintains that the ALJ's denial of disability benefits should be reversed because (1) the credibility determination is not supported by substantial evidence; and (2) the VE's testimony conflicts with the Dictionary of Occupational Titles (DOT).

Substantial evidence is "less than a preponderance but . . . enough that a reasonable mind would find it adequate to support the conclusion."[15] For substantial evidence to exist in this case, a reasonable mind must accept the evidence as adequate

---

[13]*See Anderson v. Sullivan*, 959 F.2d 690, 692 (8th Cir. 1992) (stating, "the Social Security Act precludes general federal subject matter jurisdiction until administrative remedies have been exhausted" and explaining that the appeal procedure permits claimants to appeal only final decisions).

[14]*See* 42 U.S.C. § 405(g) (requiring the district court to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner conformed with applicable regulations); *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997) ("We will uphold the Commissioner's decision to deny any applicant disability benefits if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled.").

[15]*Jones v. Astrue*, 619 F.3d 963, 968 (8th Cir. 2010) (internal quotations and citations omitted).

to support the ALJ's denial of benefits.[16]

**Credibility.** Evans asserts that the ALJ erred in the credibility determination with respect to her allegations of disabling pain and symptoms related to fibromyalgia, depression and celiac disease. After reviewing the medical record, the ALJ determined that Evans was not credible to the extent that her statements were inconsistent with the RFC.

An ALJ must evaluate the claimant's credibility because subjective complaints play a role in determining the claimant's ability to work.[17] To evaluate Evans's credibility, the ALJ followed the required two-step process and considered the required factors,[18] so the dispositive question is whether substantial evidence supports the credibility evaluation. The ALJ's determination that Evans's subjective complaints of pain and limitations were not credible to the extent that they conflict with the assigned RFC is supported by substantial evidence.

Evans's allegations of disabling pain and symptoms associated with fibromyalgia are inconsistent with the medical records. Evans has reported symptoms

---

[16]*Britton v. Sullivan*, 908 F.2d 328, 330 (8th Cir. 1990).

[17]*Ellis v. Barnhart*, 392 F.3d 988, 995-96 (8th Cir. 2005).

[18]*See* SSR 96-7p, *Policy Interpretation Ruling Titles II & XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*.

associated with fibromyalgia since July 2009.[19] Fibromyalgia is the "inflammation of the fibrous or connective tissue (muscles, joints, ligaments, and tendons) of the body. It is characterized by muscle pain, fatigue, and multiple tender points on the body."[20] Medical standards provide for a diagnosis of fibromyalgia if a patient has "widespread pain in combination with tenderness in at least 1 of the 18 sites known as trigger points."[21] In April 2010, a consulting physician noted that Evans exhibited tenderness in all 18 trigger points and assessed fibromyalgia.[22]

The records establish that Evans was not prescribed medication for fibromyalgia until approximately nine months following her initial complaints of pain.[23] This is inconsistent will allegations of disabling pain. Further, it appears that the medications prescribed for the treatment of fibromyalgia remained basically unchanged throughout the medical records. Evans was prescribed Savella and Lyrica in April 2010.[24] Evans testified at the hearing that she is still prescribed Savella and

---

[19] SSA record at p. 240.

[20] Paula Ford-Martin, Michele R. Webb & Laura Jean Cataldo, 3 The Gale Encyclopedia of Med. 1728 (4th ed.).

[21] *Id.* at p. 1729.

[22] SSA record at p. 262.

[23] *Id.*

[24] *Id.*

Lyrica.[25] The only real change in her medications has been the addition of a pain reliever, which she has also been prescribed since 2010.[26] The consistency in the medications prescribed for Evans's fibromyalgia supports the ALJ's credibility determination because it suggests that the prescription medications provide Evans with some relief. If they did not, a different course in treatment would be necessary.

The observations and notes contained in the medical records do not support allegations of disabling pain. Multiple notes indicate that Evans exhibited a full range of motion, a normal gait and/or was in no acute/apparent distress.[27] Importantly, during two appointments in which Evans complained of pain, upon physical examination her treating physician found no joint swelling, normal movements of all extremities, and/or normal muscle strength and tone.[28] In June 2011 and August 2011, Evans's treating physician noted stable myalgia,[29] stable arthralgia,[30] stable diffuse

---

[25]*Id.* at p. 53.

[26]*Id.* at p. 256.

[27]*Id.* at pp. 232, 235, 238, 242, 247, 249, 252, 254, 257, 262, 264, 266, 268, 282, 342, 346, 350, 354-355, 367 & 377.

[28]*Id.* at pp. 367 & 377.

[29]Myalgia is defined as "muscular pain." Stedman's Med. Dictionary 581020 (27th ed.).

[30]Arthralgia is defined as "pain in a joint." *Id.* at 75390.

pain and stable diffuse tenderness.[31] In August 2011, it was noted that Evans was "doing well with no complaints."[32]

Providing further support for the credibility determination is the fact that there are large periods of time in the record during which Evans sought no medical care for the allegedly disabling fibromyalgia - or for any other impairment. Following an October 2009 appointment, Evans went approximately six months without medical care.[33] In February 2012, Evans was seen by her treating physician for knee pain.[34] Subsequently, however, Evans went over a year without medical care. This is inconsistent with allegations of disabling pain, and supports the ALJ's credibility determination.[35]

---

[31]SSA record at pp. 348 & 359.

[32]*Id.* at p. 348.

[33]*Id.* at p. 263.

[34]*Id.* at p. 375.

[35]*See Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003) ("An ALJ may discount a claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment."); *Gwathney v. Chater*, 104 F.3d 1043, 1045 (8th Cir. 1997) (failing to seek medical assistance for alleged physical and mental impairments contradicted claimant's allegations of disabling conditions and supported unfavorable decision); *Ostronski v. Chater*, 94 F.3d 413, 419 (8th Cir. 1996) (complaints of disabling pain and functional limitations are inconsistent with the failure to take prescription pain medication or to seek regular medical treatment for symptoms).

In April 2011, a Physical Residual Functional Capacity Assessment was completed by an SSA physician.[36] After reviewing the medical records, the physician assigned no non-exertional limitations and determined that Evans is capable of performing light work.[37] This assessment was affirmed by a second state physician in June 2011, and supports the ALJ's credibility determination.[38]

Evans's abilities with respect to activities of daily living also weigh against her allegations of disabling pain and symptoms. In the Function Report, Evans stated that she wakes up at 6:00 a.m. and gets her children ready for school.[39] She lets the dog out and tries to clean the house.[40] In the afternoon and evening she helps her children with homework, cooks dinner with her daughter, and puts the children to bed.[41] She has no problems with personal care, and is able to drive and leave her house alone.[42] Evans is further able to grocery shop once a week for a few hours or longer.[43] In an

---

[36] SSA record at p. 289.

[37] Id. at pp. 291-293 & 296.

[38] Id. at p. 337.

[39] Id. at p. 171.

[40] Id.

[41] Id. at pp. 51 & 171.

[42] Id. at pp. 172 & 174.

[43] Id. at p. 174.

April 2011 treatment note, Evans's treating physician indicated that Evans is "[g]eneral[ly] able to do usual activities."[44]

With respect to Evans's allegations of disabling mental impairments, the medical records again fail to provide support. It appears that Evans began treatment for depression in 2006.[45] In 2009, after taking prescription medications for depression and anxiety, Evans reported that her mood and anxiety symptoms significantly improved.[46] Although Evans later complained of side effects from the anti-depressant,[47] in early 2010 she was prescribed a different anti-depressant - amitriptyline.[48] Amitriptyline was subsequently supplemented with two additional anti-depressants - Abilify and Cymbalta. Abilify was first prescribed in late 2010 and Cymbalta subsequent to the last available medical record.[49, 50] Evans remains on all

---

[44]*Id.* at p. 247.

[45]*Id.* at p. 240.

[46]*Id.* at p. 231.

[47]*Id.* at p. 234.

[48]*Id.* at p. 262.

[49]*Id.* at p. 252

[50]It is unclear whether Cymbalta was prescribed for depression or fibromyalgia. It is used in the treatment of both.

three medications.[51] This consistency in prescribed medications weighs against Evans's allegations. It suggests that the prescription medications are effective.

Indeed, although in some notes Evans is observed or reports to be depressed,[52] other indications suggest mental stability. There are multiple treatment notes in which Evans is observed to be alert and oriented to person, place and time.[53] An April 2010 progress note indicates that Evans exhibited normal speech rate and rhythm, an appropriate affect, normal judgment/insight and a logical and goal directed thought process.[54] It is important to note that following the April 2010 appointment, Evans no longer sought treatment with a mental health professional. It appears that all of her mental health needs were addressed by her treating physician. Treating physician notes from late 2010 and early 2011 observe Evans to be "pleasant."[55] In April 2011, Evans's treating physician stated that Evans's depression was controlled with her medication regimen.[56] Subsequent notes indicate that Evans exhibited an appropriate

---

[51]SSA record at p. 53.

[52]Id. at pp. 234, 237, 240, 359 & 364.

[53]Id. at pp. 238, 246, 251, 256, 262, 264, 266, 268, 270, 282, 342, 346, 354, 361 & 377.

[54]Id. at p. 238.

[55]Id. at pp. 247, 249 & 257.

[56]Id. at p. 283.

mood and affect and intact judgment and insight.[57] Importantly, subsequent to June 2011, Evans made no further complaints of depression to her treating physicians.

Medical assessments provide additional support for the credibility determination. In a May 2011, Mental Diagnostic Evaluation, a state physician determined that Evans can communicate and interact in a socially adequate manner, communicate in an intelligible and effective manner, cope with the typical demands of basic work-like tasks, attend and sustain concentration on basic tasks, sustain persistence in completing tasks, and complete work-like tasks within an acceptable timeframe unless the tasks aggravate her pain issues.[58] A Mental Residual Functional Capacity Assessment was also completed in May 2011.[59] The physician determined that Evans is moderately limited in seven of twenty mental capacities.[60] In the remaining thirteen, Evans was not significantly limited.[61] The physician concluded that Evans is capable of simple, routine, repetitive tasks and "able to perform work where interpersonal contact is incidental to work performed, e.g., assembly work;

---

[57] *Id.* at pp. 282, 361 & 367.

[58] *Id.* at pp. 303-304.

[59] *Id.* at p. 325.

[60] *Id.* at p. 327.

[61] *Id.*

complexity of tasks is learned and performed by rote, few variables, little judgment; supervision required is simple, direct and concrete (unskilled)."[62] This assessment was affirmed by a second state physician in June 2011.[63]

As stated above, the episodic treatment sought by Evans also weighs against her allegations. Logic dictates that if Evans was suffering from disabling mental impairments, she would have sought treatment more frequently. As with fibromyalgia, Evans sought no treatment for her allegedly disabling mental health impairments for periods of six months to a year. The reported daily activities also support the ALJ's credibility determination with respect to Evans's mental impairments.

Although Evans maintains that the symptoms of her celiac disease are disabling, these allegations also conflict with the medical records. In July 2009, Evans complained to her treating physician of stomach pain, diarrhea and constipation.[64] Apart from complaints of indigestion,[65] however, there are few subsequent notes specifically addressing gastrointestinal problems until Evans was

---

[62]*Id.*

[63]*Id.* at p. 338.

[64]*Id.* at p. 269.

[65]*Id.* at pp. 246 & 251.

referred to an internist in 2011.[66] The internist noted that Evans had a ten year history of diarrhea and constipation.[67] Evans was prescribed an over-the-counter probiotic and placed on a gluten-free diet.[68] In subsequent notes, Evans was "doing well with no complaints."[69] Evans indicated that she experienced "dramatic improvement" on the gluten-free diet.[70] She felt much better and was experiencing no abdominal pain, vomiting, constipation, diarrhea or heartburn.[71] The final note addressing Evans's gastrointestinal problems states that Evans was asymptomatic and "[m]uch improved with dietary changes and Nexium."[72] The physical assessments completed by state physicians and cited above provide additional support for the credibility determination.

As with the allegations with respect to the fibromyalgia and mental impairments, Evans's daily activities and episodic treatment weigh against allegations

---

[66]*Id.* at p. 283.

[67]*Id.* at p. 352.

[68]*Id.* at pp. 351 & 355.

[69]*Id.* at p. 348.

[70]*Id.* at p. 344.

[71]*Id.*

[72]*Id.* at p. 375.

of disabling pain and symptoms related to celiac disease. There are large periods of time in the record during which Evans sought no treatment for symptoms related to celiac disease.

A reasonable mind would accept the evidence as adequate to support the ALJ's credibility determination. The credibility determination is supported by substantial evidence.

**DOT conflict.** Evans argues that two of the jobs identified by the VE - call-out operator and order clerk - require regular contact with the general public. Therefore, the VE's testimony conflicts with the RFC and it was error for the ALJ to hold that Evans can perform such positions. Evans's argument is without merit.

First and foremost, it was appropriate for the ALJ to rely on the testimony of the VE. "An ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity."[73] There is no argument that one of the jobs identified by the VE - "surveillance monitor" - is a position that satisfies the assigned RFC.

Furthermore, if any error occurred, it was harmless. "To show an error was not harmless, [the claimant] must provide some indication that the ALJ would have

---

[73] *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014).

decided differently if the error had not occurred."[74] That is, to show harmful error, Evans must show the ALJ may have decided the matter differently without the error. Evans cannot show the ALJ may have decided the matter differently because in addition to the positions of call-out operator and order clerk, the ALJ determined that Evans can perform the position of surveillance monitor, a position with 730 jobs available in Arkansas and 79,280 available in the national economy.[75] Therefore, even absent the alleged error, the ALJ would have reached the same conclusion and denied Evans's DIB application.

**Conclusion.** Substantial evidence supports the ALJ's decision. If any legal error occurred, it was harmless. For these reasons, the court DENIES Evans's request for relief (docket entry # 2) and AFFIRMS the Commissioner's decision.

It is so ordered this 6th day of February, 2015.

_____
UNITED STATES MAGISTRATE JUDGE

---

[74]*Byes v. Astrue*, 687 F.3d 913, 917 (8th Cir. 2010).

[75]To the extent Evans argues that the number of surveillance monitor jobs available is not significant, the argument is unpersuasive. In *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988), the Court determined that 500 statewide jobs were numerous enough to represent a significant number.